[Cite as *In re R.S.H.-F.*, 2024-Ohio-755.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

IN RE: R.S.H.-F.

:
:
:   C.A. No. 29949
:
:   Trial Court Case No. G-2015-007346-
:   1S,1U,1W,1Z
:
:   (Appeal from Common Pleas Court-
:   Juvenile Division)
:

. . . . . . . . . . .

O P I N I O N

Rendered on March 1, 2024

. . . . . . . . . . .

D.F., Pro Se Appellant

J.H., Pro Se Appellee

. . . . . . . . . . . .

EPLEY, P.J.

{¶ 1} Plaintiff-Appellant Father appeals from the judgment of the Montgomery County Court of Common Pleas, Juvenile Division, which found that: Mother was not in contempt for missed parenting time, missed FaceTime calls, and a lack of communication; no change in circumstances justified reallocation of parental rights and responsibilities, and therefore there was no need to do a best interest of the child analysis;

and there was no error in the calculation of child support. For the reasons that follow, the judgment of the juvenile court will be affirmed.

## I.     Facts and Procedural History

{¶ 2} R.S.H.-F. was born on August 25, 2014; Father and Mother were not married. The couple cohabitated from the birth of their daughter until November 2015, when Mother and R.S.H.-F. moved to Florida, Mother's home state. Father, who filed a complaint for custody, remained in the Miami Valley.

{¶ 3} In the fall of 2016, the court adopted an agreed order in which the parties designated Mother as residential parent and legal custodian of R.S.H.-F. The parties further agreed that "until the minor child is enrolled in Kindergarten and/or until further Court Order, Plainfiff/Father shall have parenting time with the minor child twelve (12) weeks/eighty-four (84) days per year." The parenting time was further delineated by month and holiday.

**December/January** – Father shall have parenting time for seven days in either December or January to coincide with Chanukah, when possible. Mother shall be entitled to parenting time every year on Christmas Eve and Christmas Day.

**March/April** – Beginning in 2017 and in odd-numbered years thereafter, Father shall have parenting time for seven days to commence the day before Passover begins.

**May/June/July/August** – May: Father shall have parenting time for a period of 14 days starting the Monday after Mother's Day; June: Father shall

have parenting time for 14 days commencing the Saturday before Father's Day; July: Father shall have parenting time for 14 days to be agreed upon by the parties; August: Father shall have parenting time for 14 days to be agreed upon by the parties.

**September/October** – Father shall have parenting time for a period of 14 days to commence the day before Rosh Hashanah begins.

**Thanksgiving** – In even numbered years, Father shall have parenting time for a period of seven days to commence the Sunday before Thanksgiving.

{¶ 4} The agreed order also covered communication between the parties. It stated that Father was entitled to FaceTime communication with R.S.H.-F. every Monday, Wednesday, and Friday at 7:30 a.m. and each Sunday at 8:00 p.m. The calls were to last at least 15 minutes. Communication between Mother and Father was also considered, and it was ordered that, absent an emergency, the parties shall communicate concerning all child-related issues via OurFamilyWizard.com (OFW). Mother was ordered to provide notice of all scheduled medical appointments within three days of scheduling or immediately if the appointment was scheduled in less than the three-day reporting period.

{¶ 5} While the order encompassed many additional items, the parties agreed on two other points relevant to this appeal. First, the court ordered that "each party is entitled to access to any record that is related to the child or provided access, including school records." Mother was also required to ensure that Father was listed as a parent on all school and/or medical records for R.S.H.-F. Finally, Mother and Father agreed that there would be no formal exchange of child support between them.

{¶ 6} Within weeks of the enactment of the agreed order, Mother and Father began to experience difficulties with it, and their relationship turned outwardly acrimonious. According to the record, shortly after the agreement was adopted, Father changed jobs, which, according to him, made it impossible to FaceTime at 7:30 a.m. He suggested changing the time for the weekday calls, but Mother continued to call at the ordered time despite Father's not answering. Mother contends that she attempted to provide alternatives to the FaceTime schedule to accommodate Father's new work schedule. She offered a compromise of less calls per week, but with longer durations. Father did not agree and soon filed a multi-tiered motion requesting, among other things, that the FaceTime schedule be modified and that make-up calls be ordered. He also asked that Mother be held in contempt for not honoring various parts of the agreement.

{¶ 7} Over the course of the next several years, Father (and to a lesser extent, Mother) filed numerous motions with the trial court over perceived violations of the agreed order. Father believed that Mother was interfering with his access to the child's records at school and daycare facilities, that she was not notifying him of R.S.H.-F.'s activities via OFW, that she was withholding FaceTime calls, that she was not responding promptly to communications, and that she took R.S.H.-F. to France without adequate notice and then did not facilitate the requisite FaceTime calls while they were gone.

{¶ 8} Mother filed her own motion to modify/clarify the order. She wanted the number of required FaceTime calls reduced, but the time increased based on schedule feasibility. She further requested clarification regarding communication expectations and asked that a guardian ad litem (GAL) be appointed.

{¶ 9} In January 2018, the parties attempted to reach an agreement on a new order. The negotiations failed and all pending motions were dismissed by the magistrate.

{¶ 10} Many more motions were filed between 2019 and 2022. On June 17, 2019, Father filed a motion for contempt and a motion for change of custody. A show cause motion and a motion to amend visitation were filed by Father on July 6, 2020. Mother filed a motion to amend visitation on October 12, 2021. She then filed an additional motion to amend visitation and a motion to establish child support on March 11, 2022. Mother also filed a motion to transfer jurisdiction of the case to Florida. After years of litigation and delay due to COVID, the trial court denied the transfer request and we affirmed. *In re R.S.H.-F.*, 2d Dist. Montgomery No. 29198, 2022-Ohio-549.

{¶ 11} Five and a half years after the initial agreed order, the case came before the magistrate for three days of trial on March 21, May 26, and July 14, 2022. The court heard testimony from Father (who was representing himself), Mother, the GAL, the child's maternal grandparents, and her paternal grandfather. The parties presented the court with dozens of exhibits to consider.

{¶ 12} The magistrate's decision was filed on September 27, 2022. She found Mother in contempt for failing to provide Father with court-ordered FaceTime during their trip to France from May 22-June 14, 2018, and failure to inform Father of the child's withdrawal from Casa Montessori during the 2018-2019 school year. Mother was not held in contempt for not responding to communications in a timely manner, for not providing Father with other ordered FaceTime calls, for failing to provide parenting time to Father during September and October 2019, and for alleged interference with Father's access

to R.S.H.-F.'s school or daycare.

{¶ 13} The magistrate denied Father's motion for a change in custody, finding that his concerns about Mother's parenting did not rise to the level needed for a change of custody. Additionally, the existing parenting time order was modified.

{¶ 14} As pertinent to this case, the court ordered that Father have 45-minute FaceTime calls with R.S.H.-F. every Monday, Wednesday, and Thursday at 7:30 p.m. and a 15-minute (minimum) FaceTime call on Sundays at 7:00 p.m. Mother was to have the same when Father was exercising parenting time. Missed calls were ordered to be made up within 24 hours. The parties were to respond to OFW messages within 48 hours.

{¶ 15} Additionally, the court ordered that Father have parenting time during R.S.H.-F.'s summer vacation beginning a week after school gets out and lasting until two weeks before school begins again in the fall. He was also given parenting time during Thanksgiving and Christmas break pursuant to the standard order of parenting time (except that the Thanksgiving time would be for the entire week), and during spring break.

{¶ 16} Finally, Father was ordered to pay child support in the amount of $720.98 per month but was granted a downward deviation of $150 due to travel expenses.

{¶ 17} Both Mother and Father filed objections to the magistrate's decision, which were overruled by the trial court. Father now appeals, raising four assignments of error.

II. Contempt

{¶ 18} In his first assignment of error, Father argues that the trial court erred by not finding Mother in contempt for missed parenting time, missed FaceTime calls, and failure to communicate in a timely manner.

{¶ 19} Contempt is defined, in general terms, as disobedience of a court order. "Civil contempt sanctions are designed for remedial or coercive purposes and are often employed to compel obedience to a court order." *Jenkins v. Jenkins*, 2012-Ohio-4182, 975 N.E.2d 1060, ¶ 11 (2d Dist.), quoting *State v. Chavez-Juarez*, 2009-Ohio-6130, 923 N.E.2d, ¶ 24-25 (2d Dist.).

{¶ 20} "A prima facie case of civil contempt is made when the moving party proves both the existence of a court order and the nonmoving party's noncompliance with the terms of the order." *Id.* at ¶ 12, quoting *Wolf v. Wolf*, 1st Dist. Hamilton No. C-090587, 2010-Ohio-2762, ¶ 14. The fact that the contemnor acted innocently or did not intentionally disregard the court order is not a defense to a charge of civil contempt. *Pugh v. Pugh*, 15 Ohio St.3d 136, 140, 472 N.E.2d 1085 (1984). Clear and convincing evidence is the standard of proof in civil contempt proceedings. *Roberts v. Farrell*, 3d Dist. Marion No. 9-22-46, 2023-Ohio-1109, ¶ 21. It is the level of proof which would "cause a trier of fact to develop a firm belief or conviction as to the facts sought to be proven." *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus; *Haviza v. Haviza*, 2d Dist. Darke No. 2017-CA-1, 2017-Ohio-5615, ¶16. Once a violation is established, the defendant bears the burden to prove an inability to comply. *Burks v. Burks*, 2d Dist. Montgomery No. 28349, 2019-Ohio-4292, ¶ 22.

{¶ 21} A trial court's decision to find a party in contempt is reviewed for an abuse of discretion. *Id.* To constitute an abuse of discretion, a trial court's action must be arbitrary, unreasonable, or unconscionable. *Ojalvo v. Bd. of Trustees of Ohio State Univ.*, 12 Ohio St.3d 230, 232, 466 N.E.2d 875 (1984). "It is to be expected that most instances

of abuse of discretion will result in decisions that are simply unreasonable, rather than decisions that are unconscionable or arbitrary." *State v. Malloy*, 2d Dist. Clark No. 11CA0021, 2012-Ohio-2664, ¶ 24. A court's decision is unreasonable "if there is no sound reasoning process that would support that decision. It is not enough that the reviewing court, were it deciding the issue de novo, would not have found that reasoning process persuasive." *AAAA Ents., Inc. v. River Place Community Urban Redevelopment, Corp.*, 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990).

Parenting Time

**{¶ 22}** Father first claims that the court erred in its decision not to find Mother in contempt for failing to provide court-ordered parenting time. It appears from his brief that Father takes issue with missed parenting time from 2020 and 2021 and avers that as of July 14, 2022, 70 days of parenting time had been missed. He concedes, however, that 46 days had been made up, leaving a total of 24 missed parenting days.

**{¶ 23}** We first note that the number of missed and not-made-up parenting days stated in Father's brief is different from his testimony at trial, where he testified that 16 days had not been made up. Notwithstanding the difference, at the time Father claims he is owed make up days for lost parenting time (in 2020 and 2021), the order no longer required the previously agreed upon number of parenting days. The 2016 agreed order (which was created when R.S.H.-F. was approximately two years old) stated that "until the minor child is enrolled in Kindergarten and/or until further Court Order, Plainfiff/Father shall have parenting time with the minor child twelve (12) weeks/eighty-four (84) days per year." According to the magistrate's opinion adopted by the court, because R.S.H.-F. was

already in kindergarten when the purported missed parenting time occurred, there was no need to make anything up because that portion of the order was no longer in effect; "the parenting time schedule was only in place until either the child began Kindergarten or until further court order." The court's "construct signifies A or B or both." October 19, 2023 Judge's Final Appealable Order at 12.

{¶ 24} The trial court's interpretation of the order's clause made sense, and we conclude that "and/or" was a conjunction indicating that either or both of the connected terms were possible. So, in this case, we believe, as the trial court did, that the 12 weeks of parenting time was ordered until (1) R.S.H.-F. started kindergarten, (2) there was an updated court order, or (3) both occurred.

{¶ 25} Father disagrees with this interpretation. He reads the clause to mean that "the Agreed Order would remain in effect until [R.S.H.-F.] reached Kindergarten age AND the court then issued a new order, OR until the trial court issued a new order at some other time for some other reason." Appellant's Brief at 6. Father's interpretation of the phrase essentially removes any significance of reaching kindergarten and puts the entire emphasis on a court order. We do not believe this is the appropriate interpretation of the phrase.

{¶ 26} We recognize that it seems somewhat problematic that once R.S.H.-F. reached kindergarten, the requirement for Father to have parenting time ceased, but the parties had three years to modify the order with other provisions but failed to do so. It also appears that when drafting the agreed order, the parties recognized that it would be necessary to amend the parenting time requirement once the child reached school age,

as it would not be feasible to have parenting time throughout the school year. Mother and Father attempted to reach a new agreement in 2018 (the year before R.S.H.-F. entered kindergarten), but could not, leaving the original terms in place.

{¶ 27} Finally, Father's final motions to the trial court in this case were motions to show cause and contempt filed on July 6, 2020. With the exception of 14 days allegedly missed in September/October 2019, all other missed parenting days occurred *after* the July 2020 motions were filed. Father could not expect the trial court to address missed parenting time that happened after the July 2020 motion was filed absent leave from the court to amend the motion. As to the missed fall 2019 dates, Father admitted in his testimony that R.S.H.-F. had started kindergarten by that time; thus, according to the agreed order, he was not required to have the missed time.

{¶ 28} Based on the plain language of the 2016 agreed order, the trial court did not abuse its discretion when it found that Mother was not in contempt for failing to provide parenting time.

FaceTime Calls

{¶ 29} Father also asserts that Mother should have been found in contempt for missed FaceTime calls. In fact, he alleges that Mother failed to provide 439 calls since the agreed order took effect.

{¶ 30} According to the order, Father was entitled to FaceTime communication with R.S.H.-F. every Monday, Wednesday, and Friday at 7:30 a.m. and each Sunday at 8:00 p.m. The calls were to last at least 15 minutes. The record reflects, however, that almost as soon as the order was implemented, Father was unable to accept the weekday

calls. Father testified that soon after the order went into effect, he started a new job that required him to be at work at 7:30 a.m., making it impossible to FaceTime with R.S.H.-F at the mandated time. From there, Mother and Father tried to negotiate an alternative schedule. Mother suggested fewer calls, but longer durations to keep the total length of FaceTime calls in-line with the order. Father rejected that idea, preferring to keep the Monday/Wednesday/Friday/Sunday schedule, but make the calls in the evening instead of during his work hours.

{¶ 31} It appears that since the early days of the agreed order, neither party faithfully followed the court-ordered (and party agreed-upon) schedule. Instead, a makeshift timetable was followed by Mother and Father in which he and R.S.H.-F. FaceTimed at various times during the week for time periods exceeding that envisioned by the 2016 order. For instance, Father admitted at trial that very often the length of weekly FaceTime calls exceeded the hour of contact set forth in the order and that some calls had been two hours long. Paternal Grandmother testified that many Sunday FaceTime calls (in which she and Paternal Grandfather participated) lasted 45 minutes to an hour. Mother testified that now that R.S.H.-F. is older, she can FaceTime as long as she wants with Father. "Sometimes she talks until the juice runs out of the phone, sometimes she talks until she's just done on her own." Trial Tr. at 568. "[I]t's just me handing her the phone and saying 'Go talk.' * * * So, she talks for as long as is right." Trial Tr. at 569. *See also* Exhibit Q and R (showing FaceTime calls of 40 minutes, 57 minutes, 1 hour and 17 minutes, and 1 hour and 40 minutes).

{¶ 32} Based on the record before us, we cannot conclude that the trial court erred

by not finding Mother in contempt. Father complains about Mother not following the court order, but it was he who initially failed to comply by not answering FaceTime calls at 7:30 a.m. and he who initially suggested altering the scheduled times. *See* Exhibit 6 (OFW message to Mother in which Father suggested "creat[ing] a mutually agreeable Facetime schedule that preserves the spirit and intent" of the court order). Because the FaceTime schedule was mutually altered and because Father consistently received more time than the agreed order initially called for, the trial court did not abuse its discretion.

Timely Communications

**{¶ 33}** Next, Father contends that the court erred by not finding Mother in contempt for failure to communicate with him in a timely manner.

**{¶ 34}** The 2016 agreed order stated:

Absent an emergency and/or other situation requiring a more immediate response, the parties shall communicate concerning all child-related issues, including but not limited to parenting time schedules, arrangements and/or transportation; reimbursable expenses; school and activity information; doctor appointments and the like, via ourfamilywizard.com. Mother shall provide Father notice of all scheduled medical appointments for the child within three (3) days of scheduling same or immediately if the appointment has been scheduled in less than the three (3) day reporting period[.]

**{¶ 35}** Several of the instances Father highlights pertaining to Mother's alleged untimely communication happened in 2021, a year after his most recent contempt motion was filed. Father does, however, point to examples from 2017 and 2018 in which he

believes Mother's untimely communication interfered with the scheduling of July/August parenting time. With the exception of notice for medical appointments, however, there was nothing in the agreed order that required "timely communication." Father admitted this on cross-examination at trial and in his objection to the magistrate's decision. Therefore, we cannot conclude the trial court abused its discretion when it declined to find Mother in contempt for violating a "timeliness" order that did not exist.

{¶ 36} Father's first assignment of error is overruled.

### III.    Change of Custody

{¶ 37} In his second assignment of error, Father argues that the trial court erred when it found he did not prove by clear and convincing evidence that a sufficient change of circumstances had occurred to support reallocation of parental rights and responsibilities.

{¶ 38} According to R.C. 3109.04(E), a trial court "shall not modify a prior decree allocating parental rights and responsibilities for the care of children unless it finds, based on facts that have arisen since the prior decree * * *, that a change has occurred in the circumstances of the child, the child's residential parent, or either of the parents subject to a shared parenting decree, and that the modification is necessary to serve the best interest of the child." R.C. 3109.04(E)(1)(a).

{¶ 39} While not defined by statute, the phrase "change of circumstances" has been held to pertain to "an event, occurrence, or situation which has a material and adverse effect upon the child." *In re I.E.*, 2d Dist. Montgomery No. 28646, 2020-Ohio-3477, ¶ 15. (Internal citations omitted.) "A change of circumstances must be one of

substance, not slight or inconsequential, to justify modifying a prior custody order." *Davis v. Flickinger*, 77 Ohio St.3d 415, 418, 674 N.E.26 1159 (1997); *Wiram v. Wiram*, 2d Dist. Clark No. 2017-CA-32, 2017-Ohio-7436, ¶ 5.

{¶ 40} "In determining whether a change of circumstances has occurred so as to warrant a change in custody, a trial judge, as the trier of fact, must be given wide latitude to consider all issues which support such a change." *Davis* at paragraph two of the syllabus. Accordingly, we review that determination for an abuse of discretion. *In re I.E.* at ¶ 17.

<u>Communication</u>

{¶ 41} In this case, Father cites several instances that he believes should be considered as changes of circumstance. First, he alleges that Mother's alleged "unilateral reduction" in Father's in-person parenting time and FaceTime should be considered a change in circumstances. We disagree. The record does not reflect that Mother unilaterally reduced Father's parenting, either in-person or online. Even though Father's FaceTime communication with R.S.H.-F. was not always Monday, Wednesday, Friday mornings and Sunday evening, the record shows that he consistently got more FaceTime than called for in the original order. The record also demonstrates that Father was the party to initially violate the FaceTime order. As to in-person parenting time, the plain language of the order indicates that since the child was in kindergarten at the time, the fall 2019 parenting time was not mandated by the order, and any dates allegedly missed from mid-2020 on were not properly before the court. We cannot say the trial court abused its discretion in not finding this to be a change in circumstances.

{¶ 42} As to Father's contention that Mother's untimely communication was enough to warrant a change of circumstances, the order only gave communication timeliness requirements for medical appointments, and there was no allegation of a violation of that part of the order.

Education "Instability"

{¶ 43} Father also alleges that R.S.H.-F.'s purported educational instability should be considered a change in circumstances. He contends that R.S.H.-F. was "enrolled in five day cares/schools in a five year period, including two different schools during first grade and three schools in a 16 month period." Appellant's Brief at 16. Father has further concerns about absences and the child's academic performance.

{¶ 44} The record showed that, since 2018, R.S.H.-F. had attended Casa Montessori and Saint Barnabas for preschool, Reading Edge Academy for kindergarten, and then Manatee Cove Elementary, and her school at the time of the hearing, DeBary Elementary School.

{¶ 45} As to the preschools, it is not uncommon for children to go to multiple preschool programs. For instance, many children spend a year in preschool at age three or four and then do a more academic pre-kindergarten program when they are four or five to get ready for the rigors of elementary school. *See* GAL testimony at Trial Tr. at 442 (stating that it is not uncommon for there to be changes in school from preschool to pre-k to kindergarten). In regard to only spending one year at Reading Edge Academy (a charter school), Mother testified that she withdrew R.S.H.-F. in the spring of 2020 because the school discontinued in-person classes due to COVID, and she believed

kindergarteners were too young to be learning exclusively online. She then enrolled R.S.H.-F. at Manatee Cove Elementary (which was going to school in-person), her neighborhood public school, for first grade. When they moved to a new house in a better neighborhood a few miles away, R.S.H.-F. began attending DeBary, the elementary school closest to that residence. According to the trial court, the child was still enrolled at DeBary in the third grade.

{¶ 46} Father is also concerned about R.S.H.-F.'s perceived academic struggles and cites a diagnostic test showing she was below grade level in math and reading. In contrast, however, the child's most recent report cards indicated that she received "excellent" and "satisfactory" marks in all subject areas. *See* Exhibit RR. Further, the GAL noted that R.S.H.-F. was "appropriately adjusted to home, school, and community. She does well in school, and [Mother] has involved her in interesting and appropriate activities. [R.S.H.-F.]'s being bilingual will * * * be a plus for her." GAL Report at 27.

{¶ 47} Finally, Father believes that R.S.H.-F. accrued an inexcusable number of absences, especially between August 31, 2020, and June 3, 2022, when the child missed 39 days of school. Exhibit 78. Those days, though, were missed over the course of two school years (at Reading Edge Academy and DeBary Elementary). R.S.H.-F. did not miss any days while attending Manatee Cove. And of the 39 absences, 33 were excused. Further, absences on September 15, 16, 17, 18, 21, and 22, 2020; November 16, 17, 18, 19, 20, 2020; and December 11, 14, 15, 16, 17, 18, 2020, were all days missed for parenting time with Father. Trial Tr. at 787-789. The child also missed school on May 24, 25, 26, 27, 2022 due to being in Ohio for the trial. Trial Tr. at 790.

{¶ 48} Based on the record, we cannot conclude that the trial court abused its discretion when it failed to conclude that the child's educational circumstances had had a materially adverse effect evidencing a change in circumstances.

Medical Care

{¶ 49} Father next contends that there had been a change in circumstances because R.S.H.-F. had not received proper medical care. To make his point, Father first cites that R.S.H.-F. did not have a pediatrician as her primary care provider; instead, Dr. T.H., her maternal grandfather, was listed as her doctor. While he does not explicitly say so, Father's thesis seems to be that Dr. T.H. is unqualified because he does not specialize in pediatrics and practices in homeopathic medicine. We disagree.

{¶ 50} Dr. T.H. testified that he is an M.D. and had been practicing general internal medicine for 31 years. He stated that he did homeopathic medicine "when it's needed" and for those who ask for it, but he also prescribed antibiotics and had done so in the past for R.S.H.-F. He told the court that he regularly sees the child for school physicals and noted that those types of visits are essentially "well checks" (where he checks, among other things, height, weight, and vision).

{¶ 51} Father also claims that R.S.H.-F. is "completely unvaccinated." This claim was confirmed by both Mother and Dr. T.H., but it was not a change of circumstances; Father knew Mother's stance on vaccinations when he agreed that she would be the child's custodial parent. He also acknowledged that as the legal custodian, Mother had the authority to make health care decisions for the child. Trial Tr. at 292-293.

{¶ 52} Further, as it relates to the medical care of the child, Father asserts that Dr.

T.H. had not communicated with him since Mother and R.S.H.-F. moved to Florida in 2015 and that he had blocked his number on his cell phone. The doctor admitted that he did not usually respond to Father, but it was because "I don't want to be a middle man * * * in all this mess we're experiencing here." Trial Tr. at 481. He did add, however, that Father could call his office and ask to speak with him.

{¶ 53} Finally, Father states that there are reasons to be concerned about R.S.H.-F.'s physical well-being while under Mother's care. To support this assertion, Father emphasizes that R.S.H.-F. told the GAL that Mother hits her, yells at her, and locks her in her room. He also highlights the portion of the GAL's report which states that the child's teacher observed her wearing stained or dirty clothing and that R.S.H.-F. was "constantly fidgeting with her groin region" and asking to go to the bathroom many times a day.

{¶ 54} The GAL was skeptical of R.S.H.-F.'s story about Mother hitting her because it was the first thing out of her mouth when they started talking. "My recollection is, gee, we sat down and boom, out with it. I hadn't even asked any questions and she was prepared to tell me what she wanted." Trial Tr. at 438. "It was shocking to me that I hadn't even gotten the question out of my mouth and yet she started saying that." Trial Tr. at 452. It was the GAL's opinion that the statements should not be given much weight.

{¶ 55} Even if Mother did use corporal punishment as a means of discipline, "parents are entitled to utilize disciplinary measures for their children" unless it becomes unreasonable. *State v. Middleton*, 2d Dist. Greene No. 2019-CA-22, 2020-Ohio-1308, ¶ 34; *State v. Suchomski*, 58 Ohio St.3d 74, 75, 567 N.E.2d 1304 (1991) ("A child does not have any legally protected interest which is invaded by proper and reasonable

parental discipline.") There is no indication of unreasonable discipline or abuse in the record.

**{¶ 56}** As to the allegations that the child's hygiene needs were not being met, Mother testified that she washed R.S.H.-F.'s clothes and bathed her and that the school had never contacted her about hygiene concerns.

**{¶ 57}** Overall, Father failed to offer any testimony or evidence showing any health issues with R.S.H.-F., and the GAL observed her to be healthy. There is nothing in the record that would demonstrate that the trial court abused its discretion when it stated that it "cannot conclude that Father presented evidence that the child is not receiving proper medical care, particularly not to a degree that would constitute a change in circumstances."

**{¶ 58}** Father's second assignment of error is overruled.

### IV.     Best Interest of the Child

**{¶ 59}** Father also argues that the trial court "erred by not doing a best interest of the child analysis and determining that the benefit of reallocating parental rights and responsibilities outweighs any potential harm." Appellant's Brief at 19.

**{¶ 60}** When considering a motion for a change of custody, the trial court must first determine whether there has been a change of circumstances. *Wilburn v. Wilburn*, 144 Ohio App.3d 279, 286, 760 N.E.2d7 (2d Dist.2001). "The court may proceed to a best-interest analysis only after the court has determined that a change in circumstances has occurred." *Foxhall v. Lauderdale*, 11th Dist. Portage No. 2011-P-0006, 2011-Ohio-6213, ¶ 32. This prophylactic is meant to prevent a constant re-litigation of issues that have

already been determined by the court. *Wilburn* at 286.

{¶ 61} Here, the trial court found that none of Father's claims constituted a change in circumstances because none had an adverse, material effect on the child. Thus, it was not required to conduct a best interest analysis. The third assignment of error is overruled.

### V. Child Support

{¶ 62} In Father's final assignment of error, he alleges that the trial court erred in calculating his income, by not imputing income to Mother, and by miscalculating deviations in making the child support determination.

Father's Income

{¶ 63} Father's chief argument appears to be that, although the child support worksheet listed his 2021 gross income as $116,384, there was no real way of knowing what the final number would be because his pay structure was variable, and the actual number would likely be lower.

{¶ 64} "In any action in which a court child support order is issued or modified * * *, the court or agency shall calculate the amount of the obligor's child support obligation in accordance with the basic child support schedule, the applicable worksheet, and the other provisions of sections 3119.02 to 3119.24 of the Revised Code." R.C. 3119.02; *Johnson v. McConnell*, 2d Dist. Montgomery No. 24115, 2010-Ohio-5900, ¶ 14.

{¶ 65} The amount of support that would be payable under a child support order, as calculated pursuant to the basic child support schedule and worksheet, is rebuttably presumed to be the correct amount of child support due. R.C. 3119.03. The child support worksheet must be included in the record so the appellate court can meaningfully review

the order. *Johnson v. McConnell*, 2d Dist. Montgomery No. 24115, 2010-Ohio-5900, ¶ 14. We review the trial court's decision regarding child support obligations for an abuse of discretion. *Duff v. Duff*, 2d Dist. Montgomery No. 26043, 2014-Ohio-3750, ¶ 10.

**{¶ 66}** Father testified at trial that he was a customer success manager at a subsidiary of LexisNexis and that, under the terms of his employment, he received a salary of $67,000 per year. Trial Tr. at 148. He also, according to his testimony, had a "Variable Compensation Plan" in which he received additional compensation every quarter based on the performance of his department. How much extra, though, was not certain.

**{¶ 67}** According to the limited financial record before us, it is clear that Father made $102,485.44 (gross) in 2020. Exhibit MM (2020 W-2 form). As to Father's compensation beyond 2020, there were only a couple of pieces of evidence. First, a paystub from September 2021 (Exhibit NN) showed he had grossed $88,001.71 to that point in the year. There was no indication how much of that number was his salary versus what was "variable compensation." The other financial document in the record is what can best be described as a salary chart. Exhibit OO. It showed that, as of February 28, 2021, Father had a "total base pay" of $65,484 but a "primary compensation basis" of $116,384. Father's 2021 W-2 is not a part of the record, nor is any financial document from 2022, the year of the trial. Accordingly, the most recent indication of what Father's full-year gross income would be was the salary chart from Exhibit OO that described the "primary compensation basis" as $116,385. The September 2021 paystub was more recent temporally, but as Father asserts in his brief, "variable compensation is not

distributed evenly throughout the year." Appellant's Brief at 21. Thus, based on the uncertainty of the record, we cannot say the trial court abused its discretion when it found $116,385 to be the appropriate gross income imputed to Father.

{¶ 68} Nevertheless, Father argues that under R.C. 3119.05(D), the court should have chosen the lesser of the yearly average of all overtime, commission, and bonuses received in the prior three years or the total of all overtime, commission, and bonuses received in the prior year. He argues that by either method, $116,385.00 was too high. The problem with this argument, though, is that according to Father's own testimony, R.C. 3119.05(D) does not apply because the "variable compensation plan * * * is not a salary and **it's not a bonus**, and it's not based on my individual performance." (Emphasis added.) Trial Tr. at 149. And, as Mother points out in her brief, Father never stated what the correct income actually was. A silent argument is insufficient to overcome the discretion of the trial court.

<u>Mother's Income</u>

{¶ 69} Next, Father avers that the trial court erred by not imputing income to Mother and contends that she has been voluntarily underemployed since 2013. He believes the trial court erred by not analyzing the "potential income" factors set forth in R.C. 3119.07(C)(17).

{¶ 70} Whether a parent is voluntarily unemployed or underemployed is a question of fact to be determined by the trial court based on the circumstances of the case. *Rock v. Cabral*, 67 Ohio St.3d 108, 112, 616 N.E.2d 218 (1993). The trial court's determination will not be disturbed on appeal absent an abuse of discretion. *Id.* "Once a trial court

determines that a parent is voluntarily unemployed or underemployed, the court must determine the amount of income to impute based on the factors set forth in R.C. 3119.01(C)." *Bentley v. Bentley*, 3d Dist. Marion No. 9-04-09, 2004-Ohio-5100, ¶ 10. *Accord Banchefsky v. Banchefsky*, 10th Dist. Franklin No., 2010-Ohio-4267, ¶ 8 ("[B]efore a trial court may impute income to a parent, it must first find that the parent is voluntarily unemployed or underemployed.").

{¶ 71} In 2013, Mother made approximately $70,000 working as a librarian, but then resigned, gave birth to R.S.H.-F. and stayed at home with the child for a number of years. Since then, she graduated from a Florida law school, passed the Florida bar exam, and began working as a first-year associate at a small law firm, earning approximately $50,000 per year.

{¶ 72} The trial court did not believe that Mother was underemployed, finding that she was "gainfully employed within the scope of her education as a licensed attorney." Based on that determination, the trial court was not required to analyze the imputed income factors and therefore did not abuse its discretion.

{¶ 73} Father also alleges that the court should have imputed income to Mother because she is trustee and/or beneficiary of a land trust. While it was undisputed that Mother held some interest in a family trust, both Mother and her father testified that she did not derive any economic benefit from the trust, and Maternal Grandfather told the court that the land trust was in his name and that he paid the taxes. Trial Tr. at 469, 491. Simply put, Father presented no evidence that Mother profited in any way from the trust and, thus, the trial court did not abuse its discretion.

<u>Deviations</u>

**{¶ 74}** Finally, Father claims that the trial court erred by not accurately calculating deviations for parenting time travel when making the child support determination. He believes the court abused its discretion when it found a $150 monthly deviation was reasonable.

**{¶ 75}** R.C. 3119.22 states that a court "may order an amount of child support that deviates from the amount of child support that would otherwise result from the use of the basic child support schedule and the applicable worksheet if * * * [it] determines that the amount calculated * * * would be unjust or inappropriate and therefore not be in the best interest of the child."

**{¶ 76}** Father argues that since 2016, he has traveled to Florida for parenting time at least seven times per year and has paid for all of his travel expenses at a cost of approximately $1,000 per month. According to him, it stands to reason that because he will now (according to the new order) be traveling only three times per year for parenting time, he should get a 43% reduction (3 is 43% of 7), meaning the court should have ordered a $430 deviation. While Father's logic is clear, the court's $150 per month deviation was not an abuse of discretion. The trial court could have estimated the cost of two plane tickets (one for Father and one for R.S.H.-F.) three times per year and divided that by 12 months to come up with the $150 per month deviation. The court's deviation determination was reasonable and therefore not an abuse of discretion.

**{¶ 77}** Father's fourth assignment of error is overruled.

**VI.    Conclusion**

{¶ 78} The judgment of the trial court will be affirmed.

. . . . . . . . . . . . .


TUCKER, J. and LEWIS, J., concur.